BIRMINGHAM FOOD TERMINAL, INC.,
a corporation, et al., Plaintiffs,

v.

SOUTHERN RAILWAY COMPANY, a
corporation, et al., Defendants.

UNITED STATES of America,
Plaintiff,

v.

SOUTHERN RAILWAY COMPANY, a
corporation, et al., Defendants.

SOUTHERN RAILWAY COMPANY
et al., Plaintiffs,

v.

A K INVESTMENT CORPORATION
et al., Defendants.

Civ. A. Nos. 9080, 9155, 9815.

United States District Court
N. D. Alabama, S. D.

June 8, 1962.

No. 9080:

Pritchard, McCall & Jones, Birmingham, Ala., for plaintiffs.

Cabaniss & Johnston, Birmingham, Ala., for defendants.

No. 9155:

Daniel M. O'Donoghue, Atty., Bureau of Inquiry & Compliance, I.C.C., Macon L. Weaver, U. S. Atty., and M. L. Tanner, Asst. U. S. Atty., Birmingham, Ala., for plaintiffs.

Cabaniss & Johnston, Pritchard, McCall & Jones, Chas. E. Cleveland, James C. Barton, Robert S. Gordon, George S. Brown and Spain, Gillon & Young, Birmingham, Ala., and Glenn M. Elliott, Memphis, Tenn., for defendants.

White, Bradley, Arant, All & Rose, David J. Vann, Francis H. Hare and D. H. Markstein, Jr., Birmingham, Ala., and, A. Alvis Layne, Washington, D. C., for intervening plaintiffs.

No. 9815:

Cabaniss & Johnston, Birmingham, Ala., and William D. McLean and N. K. Sneed, III, Washington, D. C., for plaintiffs.

Pritchard, McCall & Jones, Birmingham, Ala., for defendants.

LYNNE, Chief Judge.

These actions, having been consolidated by order on pretrial hearing entered January 15, 1962, were tried to the court, without the intervention of a jury, from April 23, 1962, through May 2, 1962, on a mass of documentary evidence and oral testimony.

The common threads which run through these cases are the paramount questions of what rentals must be charged and collected by Southern from tenants at the Birmingham Food Terminal and what is the minimum price for which any of such premises may be sold.

Since the facts disclosing unlawful rebates, favoritism and unjust discrimina-

tions allowed and practised by Southern at the Birmingham Food Terminal in favor of tenants who have been shippers or consignees of freight or who have been otherwise interested in or affected by rates on shipments moving into or out of such terminal were explicated in the report and order of the Interstate Commerce Commission, dated October 6, 1959, in Shaw Warehouse Company v. Southern Railway Company et al., 308 I.C.C. 609 (Docket No. 32241), were discussed at length in Southern Railway Company v. United States, 186 F.Supp. 29 (N.D.Ala.1960), and were adverted to in Shaw Warehouse Company v. Southern Railway Co., 288 F.2d 759 (C.A. 5 1961), rehearing denied, 294 F.2d 850 (C.A. 5 1961), the court is content to adopt such findings of fact as supported by the evidence adduced upon the trial of these cases.

■ In an effort to bring the issues into proper perspective and to compress into ultimate findings the multitudinous facts in a complicated record, the court has focused its attention upon the situation as it existed on September 1, 1960, the effective date of the I.C.C. order referred to hereinabove and has determined not to apply such order retrospectively.

The chronology of these cases, the parties thereto and the issues tendered therein have influenced the court in molding a decree which will accomplish equal justice between all affected parties.

## CIVIL ACTION NO. 9080

The complaint was filed on May 15, 1958. Plaintiffs may be generically described as parties who were then tenants at the Birmingham Food Terminal. Either they or their predecessors had entered into the "Round Robin Agreement", dated October 18, 1955, which related generally to the eventual sales price of each building at the Terminal and the intermediate rental to be paid pending consummation of the sale. Defendants were Southern Railway Company, a corporation, (hereafter Southern) and its wholly owned subsidiary, Georgia Industrial Realty Company, a corporation (hereafter for obvious reasons omitted or ignored except in the court's order).

Plaintiffs alleged a dispute as to the amount of construction costs which should enter into the agreed basis for computing both rentals and sales prices and prayed for a declaratory judgment establishing rentals and sales prices to be paid by them to defendants.

## CIVIL ACTION NO. 9155

The complaint was filed July 18, 1958. The plaintiff was the United States of America. Defendants were Southern and tenants who had signed the "Round Robin Agreement", and realty holding companies subleasing to the tenants at the Food Terminal, allegedly shippers or receivers of freight. Contending that the course of transactions between Southern and the tenants constituted a conspiracy by all to violate the provisions of the Elkins Act against offering, granting, giving and soliciting, accepting and receiving rebates, concessions, advantages, and discriminations, plaintiff prayed for an injunction against the sale of any premises at the Food Terminal at less than full cost or fair market value and the renting of such premises at rentals less than the fair market rental or rentals computed upon the full cost of such premises.

There was a prayer for a temporary restraining order which was set down for hearing on July 21, 1958. On the appointed date the court was advised that extensive hearings relating to the Birmingham Food Terminal project had been held before an examiner of the Interstate Commerce Commission, which in due time would issue a report and order, and that private suits for damages instituted by Shaw Warehouse Company, Birmingham Ice and Cold Storage Company, and Boggs Cold Storage Company against Southern were then pending on the docket of this court. Counsel representing the interests of the United States, the Interstate Commerce Commission, the tenants and the private litigants entered

into a full discussion with the court as to what procedures should be followed in order to avoid unseemly conflict between Commission order and court decree. It was recognized that the result of the private litigation might be inconsistent with Commission action. Counsel for plaintiffs in Civil Action No. 9080, above, vigorously insisted that their case, first filed, should be first tried.

The court expressed an opinion that good judicial administration suggested that the private cases should be tried at the earliest practicable date, whether or not the Commission had theretofore entered its report and order; that the status quo should be preserved in this case, and that the trial of number 9080 should be held contemporaneously with or after the final disposition of this action. Counsel for all interested parties except the attorneys for the defendant tenants, as appears above, agreed to this procedure.

On July 30, 1958, Southern and the United States having entered into a stipulation that Southern would not execute and deliver a conveyance of title to any of the properties included in the Birmingham Food Terminal without first having given a thirty-day notice to the Interstate Commerce Commission of intention to convey, the court entered an order continuing the prayer for a temporary restraining order to be reset only upon motion of plaintiff. No motion for resetting was ever filed.

## CIVIL ACTION NO. 9815

The complaint was filed November 18, 1960. Plaintiff was Southern. Defendants were then tenants at the Food Terminal and had signed or were successors in interest to those who did sign the "Round Robin Agreement." The complaint adverted to the order of the Interstate Commerce Commission, effective September 1, 1960, and contained prayers that the rent levels established by the "Round Robin Agreement" be declared illegal (by subsequent amendment Southern made it plain that it did not con-

cede the invalidity of the "Round Robin Agreement," but recognized that it was bound by the Commission order); that judgment be entered in favor of plaintiff and against each defendant for the difference between the rent actually paid by each defendant from and after September 1, 1960, and the rents established by the I. C. C. order and that each defendant be permanently enjoined from continuing to occupy his respective premises at the Birmingham Food Terminal without paying rent at the level required by the I. C. C. order.

Neither Jefferson Warehouse and Cold Storage Company (hereafter Jefferson Company) nor W. C. Hudlow, Jr. (hereafter Hudlow) was a party to any one of these three cases until added as defendants to the complaint in intervention filed in behalf of Birmingham Ice and Cold Storage Company and Shaw Warehouse Company on May 5, 1961, allowed June 2, 1961. On September 1, 1961, the United States filed an amended complaint adding Jefferson Company and Hudlow, together with Southern Bonded Warehouse Company as parties defendant, which amendment was allowed October 12, 1961.

It was conceded that neither the pertinent provisions of the Elkins Act, 49 U.S.C.A. §§ 42 and 43, nor of the Interstate Commerce Act, 49 U.S.C.A. §§ 2, 3 and 6(7), nor the order of the Interstate Commerce Commission, supra, apply to tenants not shown to have been shippers or receivers of freight or interested in or affected by rates on shipments moving in or out of the Food Terminal. A heated contest developed upon the fact issue thus raised. Without discussing the welter of evidentiary details, the court, declining to apply the doctrine of "de minimis", finds that the tenants and realty holding companies whose names appear hereinbelow on the schedule of rents to be charged and collected by Southern, are shippers or receivers of freight.

Defendant, George Espy Produce Company, has never been a shipper or receiver

of freight. Neither W. L. Smith Poultry Company, Inc., nor its successor, Smith's Pride, Inc., occupied premises at the Food Terminal on or after September 1, 1960.

Southern Bonded Warehouse Company, a corporation, was a shipper or receiver of freight on and after September 1, 1960. However, it paid in full all rentals computed according to the I. C. C. order and has since removed from the Terminal. Accordingly appropriate orders of dismissals are due to be entered as to each of these above-named defendants.

Following is a schedule of the numbered buildings at the Birmingham Food Terminal, the tenant of each occupied building as of September 1, 1960, together with the minimum price at which each building may be sold and the minimum monthly rental at which each building may be rented in compliance with the order of the Interstate Commerce Commission, supra.

At the conclusion of oral arguments on May 2, 1962, all tenants in buildings for which minimum monthly rentals are fixed in the schedule below were advised that such rentals were due and payable by them for the month of May, 1962, and for each month thereafter, except the tenant George Espy, who is neither a shipper nor a receiver of freight.

| Building No. | Tenant | Minimum Sales Price | Minimum Monthly Rental |
|---|---|---|---|
| 1 | Doc's Transfer & Whse Co. Piggly-Wiggly (sub-tenant) | $150,153.56 | $1,239.32 |
| 2 | Dealt with separately | – – – | – – – |
| 3 | Alabama Potato Service | 68,200.13 | 564.29 |
| 4 | Vacant | 92,211.33 | 760.64 |
| 5 | Vacant | 333,536.62 | 2,771.36 |
| 6 | S. T. Jerrell Company | 107,636.18 | 890.45 |
| 7 | Alabama Paper | 161,549.81 | 1,335.01 |
| 8 | Dealt with separately | – – – | – – – |
| 9 | Birmingham Frozen Foods | 149,276.30 | 1,239.40 |
| 10 | Vacant | 60,887.50 | 502.51 |
| 11 | Bruno's Food Stores | 97,992.70 | 808.50 |
| 12 | Bryan Bros. Packing Co. | 439,065.15 | 3,650.57 |
| 13 | Early American Foods, Inc. | 45,621.18 | 376.87 |
| 14 | Home Provision Company | 79,550.15 | 660.14 |
| 15 | Associated Grocers of Ala. | 697,946.98 | 5,778.88 |
| 16 | Simonetti, Inc. and Simonetti Realty Co., Inc. | 181,448.04 | 1,497.40 |
| 17 | Flint Refrigeration Co. and A. & L. Realty Co., Inc. | 128,927.84 | 1,066.17 |
| 18 | Eidson Produce Co. and Eidson Realty Co., Inc. | 193,347.35 | 1,599.18 |
| 19 | Alex Kontos Fruit Co. & A. K. Investment Co. | 59,647.66 | 494.17 |
| 20-A | Magic City Produce Co. | 195,019.12 | 1,612.23 |
| 20-B | George Espy* | 154,043.30 | 1,274.38 |

* Not shipper or receiver of freight. Minimum sales price and monthly rental applicable only in the event this building is sold or rented to shipper or receiver of freight.

■ Careful consideration has been accorded to the contentions of Southern and the United States that each of such tenants should be required to pay in fair and equitable installments the difference between the rent actually paid by such tenant and the rent which the court finds that Southern is compelled to charge and collect under the order of the Interstate Commerce Commission, at least from and after September 1, 1960. Perforce, the court recognizes the merit of this position. In the exercise of its discretion, the court is influenced to require payment by such tenants and collection by Southern of the new rents only from and after May 1, 1962.

■ Number 9080 was a true adversary proceeding. Therein these tenants and their predecessors in interest were bitterly complaining of the allocation by Southern of construction costs to the base upon which the sales price and the rental of each building was to be computed according to the outstanding agreement. It is true that their complaints were swept aside by the order of the Interstate Commerce Commission of which they are conclusively presumed to have had notice and by which they are legally bound. But it is worthy of note that the Commission was not unanimous in concluding that the agreed rentals and sales prices were less than fair market value or less than compensatory and that a jury in the private litigation, Shaw Warehouse Company v. Southern Railway Co., 288 F.2d 759 (C.A.5 1961), after considering most of the evidence before the Commission and much that was not, found that such agreed rentals and sales prices were not violative of the Interstate Commerce Act. Moreover, in Civil Action number 9155 each tenant has continued stoutly to maintain that its connection with the shipment or receipt of freight moving into or out of the Food Terminal has not been and is not now such as to bring it within the coverage of the Elkins Act or the Interstate Commerce Act. Each has invoked the doctrine of "de minimis" to sustain it.

While the court has concluded otherwise, it required a full dress trial to reach this result.

As to the Jefferson Company and Hudlow, tenants of buildings numbered 2 and 8, matters stand differently. Civil Action number 9155 was not brought under Section 16(12) of the Interstate Commerce Act (49 U.S.C.A. § 16(12)). It is a proceeding under Section 3 of the Elkins Act (49 U.S.C.A. § 43) and Section 20(9) of the Interstate Commerce Act (49 U.S.C.A. § 20(9)) to enforce such Acts. The court and the parties are bound by the report and order in Shaw Warehouse Company v. Southern Railway Company, supra.

On and prior to July 1, 1958, Thomas N. Nelson and Company (hereafter Nelson Company) occupied building number 2 and Birmingham Terminal Cold Storage (hereafter Terminal Cold Storage) occupied building number 8 at the Food Terminal and each of them conducted therein a public cold storage warehouse business in direct competition with the intervenor, Birmingham Ice and Cold Storage Company. Each was a shipper or receiver of freight. As of July 1, 1958, Nelson Company owed back rents, later found inadequate by the Commission, in the amount of $176,410.04 and Terminal Cold Storage owed $61,239.88. Neither was able to pay its arrearage and neither was able to continue its operation.

Into this atmosphere entered Hudlow, who for sometime theretofore had been operating his wholly owned Chattanooga Warehouse and Cold Storage Company (hereafter Chattanooga) at Southern's Chattanooga Food Terminal. He knew that the rental practices at the Birmingham Food Terminal were under investigation by the Commission and that Civil Action number 9155 had been filed in this court.

In July, 1958, Hudlow entered into an agreement with Southern to take over and operate these warehouse facilities at a basic rental rate below that later prescribed by the Commission, to be charged

solely on the basis of space actually utilized, thus insuring himself against the normal business risks inherent in a contracting and expanding market. He was assured of Southern's cooperation in preserving the continuity of operations vis-à-vis customers of Nelson Company and Terminal Cold Storage who held outstanding warehouse receipts and in protecting the good will of these companies.

Jefferson Warehouse was organized in July, 1958; its paid-in capital was $1,000 and all of its stock was owned by Hudlow. It formally became a tenant of buildings numbers 2 and 8 on August 1, 1958, on the above-mentioned rental basis. During July and August, 1958, with Southern's approval, Hudlow purchased all of the stock of Nelson Company in consideration of one dollar and an agreement to employ its president for five years at an annual salary of $7,200. He purchased all of the stock of Terminal Cold Storage in consideration of one dollar and an agreement that he would repay the principal of an outstanding bank loan, personally endorsed by the owners, in the amount of $20,500 out of the profits of the cold storage warehouse business then being operated in building number 8.

Thereafter the stock thus acquired was endorsed in blank and delivered to Southern. But the assets of each company were placed in the hands of a vice president of Jefferson Company for liquidation. None of such assets were applied to unpaid rents. On the contrary, they were used to protect the good will of the going businesses to which Jefferson Warehouse succeeded. Along with a major portion of the sum of $15,700 deposited by Southern to the account of Nelson Company they were expended for the payment of trade accounts, for furnishing warehouse equipment to the use of Jefferson Company by making lease or note payments to prevent repossession of such equipment, and for transferring precollected warehouse charges to furnish working capital to Jefferson Company.

██ Hudlow insists that the record of this trial is barren of evidence connecting him individually with the shipment or receipt of freight. But the finding that the foregoing concessions granted by Southern to Jefferson Company were solicited by Hudlow personally and were availed of by his wholly owned corporation, created as a part of the concession device, requires nonrecognition of the legal fiction of a separate corporate entity. This principle is too well established to require extensive citation of authorities. See e. g., United States v. Milwaukee Refrigerator Transit Co., 142 F. 247 (E.D.Wis.1905). From and after September 1, 1960, Jefferson Company has paid rent on buildings numbers 2 and 8, computed by Southern in compliance with the Commission order, on the basis of the space actually utilized by it in each of such buildings. Since the court finds that at all times each entire building, including office space but excluding each future expansion area, has been made available by Southern for use by Jefferson Company, the court concludes that from and after September 1, 1960, the rent for each building should have been charged and collected on the basis of entire as opposed to partial occupancy.

Insisting that it derived no conceivable benefit therefrom, Jefferson contends that there should be excluded from the rent base the early completion cost in the amount of $26,500 and the cost incurred to correct defectively installed refrigeration equipment in the amount of $18,229.-67, as to building number 2, and the early completion cost of $40,000 and the latent defect cost of $15,010.12, as to building number 8.

██ In view of the circumstances, adverted to above, surrounding the transition of the going businesses of previous tenants to Jefferson, the court holds that such cost items are necessarily includable in the rent base.

Finding that the expansion area provided for building number 2 was occupied by Jefferson Company only for the period from September 1, 1960, through January, 1961, and that the expansion area

provided for building number 8 was at no time occupied by or available to Jefferson Company in calculating the back rent due Southern by Jefferson Company and Hudlow the court has taken into consideration only rent due for the expansion area of building number 2 for the period of actual occupancy.

The court finds that to have avoided unjust discrimination, favoritism, and invidious rebates, Southern should have charged and collected and Jefferson Company and Hudlow should have paid from September 1, 1960, through April 30, 1962, including the five months occupancy of the expansion area of building number 2, rents aggregating $431,251.57, whereas Southern charged and collected and Jefferson Company and Hudlow paid as rentals the sum of $401,493.56. Thus, judgment is due to be entered in favor of Southern and against Jefferson Company and Hudlow in the amount of $29,758.41 with appropriate decretal provisions for its expeditious collection and payment without the aid of Southern's credit.

Following is a schedule of the minimum sales price and the minimum monthly rental for buildings numbers 2 and 8, together with the expansion area of each building, established by this judgment:

| Building No. | Tenant | Minimum Sales Price | Minimum Monthly Rental |
|---|---|---|---|
| 2 | Jefferson Warehouse No. 1 | $1,581,858.46 | $12,458.88 |
| Expansion Area Building No. 2 | Vacant | | 648.18 |
| 8 | Jefferson Warehouse No. 2 | 1,153,767.81 | 8,941.67 |
| Expansion Area Building No. 8 | Vacant | | 634.16 |

Alabama Potato Service, Inc., tenant of building number 3 and a party to these actions, has paid no rent for any month since November, 1961. Judgment will be entered in favor of plaintiffs in Civil Action No. 9815 against such defendant with a provision for the eviction of such tenant upon default in the satisfaction of such judgment.

Prudence requires that jurisdiction of these actions be retained by the court for the following purposes: (1) to entertain and dispose of by appropriate order any petition by Southern or the United States for the eviction of any tenant who is a shipper or receiver of freight and who fails to make timely payments of rentals at the prescribed level; (2) to reconsider the reasonable level of rents or the sale price of terminal premises as justice may require in the light of radical changes in the economic situation; (3) to determine, if necessary, the status of new tenants locating at the Birmingham Food Terminal with respect to the shipment or receipt of freight.

It is accordingly ORDERED, ADJUDGED and DECREED by the court as follows:

(1) That these actions be and they are hereby dismissed as they pertain to the following parties, Southern Bonded Warehouse Company, W. L. Smith Poultry Company, Smith's Pride, Inc., and George Espy Produce Company.

(2) That Southern Railway Company and Georgia Industrial Realty Company have and recover of Alabama Potato Serv-

ice, Inc., the sum of $2,562.00, for which, unless presently paid, execution may issue, and Alabama Potato Service, Inc., its agents, servants, attorneys and privies, and each of them are hereby permanently enjoined and restrained from occupying premises at the Birmingham Food Terminal on and after July 1, 1962, in the event such judgment is not paid in full on or before such date.

(3) That the parties hereto who appear as tenants at the Birmingham Food Terminal in the following schedule, their agents, servants, attorneys and privies, and each of them, are hereby permanently enjoined and restrained from occupying premises at the Birmingham Food Terminal at monthly rentals less than those provided in such schedule or from purchasing premises thereat at prices less than those shown in such schedule, and further, from occupying such premises as tenants without the payment of such monthly rentals in advance.

| Building No. | Tenant | Minimum Sales Price | Minimum Monthly Rental |
|---|---|---|---|
| 1 | Doc's Transfer & Whse Co. Piggly-Wiggly (sub-tenant) | $ 150,153.56 | $ 1,239.32 |
| 2 | Jefferson Company & W. C. Hudlow, Jr. | 1,581,858.46 | 12,458.88 |
| 3 | Alabama Potato Service | 68,200.13 | 564.29 |
| 6 | S. T. Jerrell Company | 107,636.18 | 890.45 |
| 7 | Alabama Paper | 161,549.81 | 1,335.01 |
| 8 | Jefferson Company & W. C. Hudlow, Jr. | 1,153,767.81 | 8,941.67 |
| 9 | Birmingham Frozen Foods | 149,276.30 | 1,239.40 |
| 11 | Bruno's Food Stores | 97,992.70 | 808.50 |
| 12 | Bryan Bros. Packing Co. | 439,065.15 | 3,650.57 |
| 13 | Early American Foods, Inc. | 45,621.18 | 376.87 |
| 14 | Home Provision Company | 79,550.15 | 660.14 |
| 15 | Associated Grocers of Ala. | 697,946.98 | 5,778.88 |
| 16 | Simonetti, Inc. and Simonetti Realty Co., Inc. | 181,448.04 | 1,497.40 |
| 17 | Flint Refrigeration Co. and A. & L. Realty Co., Inc. | 128,927.84 | 1,066.17 |
| 18 | Eidson Produce Co. and Eidson Realty Co., Inc. | 193,347.35 | 1,599.18 |
| 19 | Alex Kontos Fruit Co. & A. K. Investment Co. | 59,647.66 | 494.17 |
| 20-A | Magic City Produce Co. | 195,019.12 | 1,612.23 |

(4) That defendants Southern Railway Company and Georgia Industrial Realty Company, their agents, servants, attorneys and privies, and each of them, are hereby permanently enjoined and restrained from directly or indirectly renting to tenants who are shippers or receivers of freight and from selling to persons who are shippers or receivers of freight premises at the Birmingham Food Terminal for rents or sales prices less than those established for each building at such terminal as follows:

| Building No. | Minimum Sales Price | Minimum Monthly Rental |
|---|---|---|
| 1 | $ 150,153.56 | $ 1,239.32 |
| 2 | 1,581,858.46 | 12,458.88 |
| 3 | 68,200.13 | 564.29 |
| 4 | 92,211.33 | 760.64 |
| 5 | 333,536.62 | 2,771.36 |
| 6 | 107,636.18 | 890.45 |
| 7 | 161,549.81 | 1,335.01 |
| 8 | 1,153,767.81 | 8,941.67 |
| 9 | 149,276.30 | 1,239.40 |
| 10 | 60,887.50 | 502.51 |
| 11 | 97,992.70 | 808.50 |
| 12 | 439,065.15 | 3,650.57 |
| 13 | 45,621.18 | 376.87 |
| 14 | 79,550.15 | 660.14 |
| 15 | 697,946.98 | 5,778.88 |
| 16 | 181,448.04 | 1,497.40 |
| 17 | 128,927.84 | 1,066.17 |
| 18 | 193,347.35 | 1,599.18 |
| 19 | 59,647.66 | 494.17 |
| 20-A | 195,019.12 | 1,612.23 |
| 20-B | 154,043.30 | 1,274.38 |

In the event any such tenant becomes delinquent in the payment of such rent for more than thirty days, Southern Railway Company is ordered, directed and commanded to file a petition herein containing a prayer for the eviction of such tenant.

(5) That defendants Southern Railway Company and Georgia Industrial Realty Company, their agents, servants, attorneys and privies, and each of them, are hereby permanently enjoined and restrained from directly or indirectly advancing or pledging credit to any person, firm, or corporation for the purchase by or in behalf of any shipper or receiver of freight of any premises at the Birmingham Food Terminal.

(6) That Southern Railway Company and Georgia Industrial Realty Company have and recover of Jefferson Warehouse Company, a corporation, and W. C. Hudlow, Jr., the sum of 29,758.41, and that unless Jefferson Warehouse Company, a corporation, and W. C. Hudlow, Jr. shall pay said judgment, with interest at 6 percent from the date of this decree, on or before October 1, 1962, process of eviction will be issued by this court.

(7) That jurisdiction of these actions be and the same is hereby retained for the purposes hereinabove enumerated, for the purpose of giving full effect to this judgment, and for the purpose of making such further and other orders and decrees, or taking such further action, if any, as may become necessary or appropriate to carry out and enforce its judgment.